**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

_____
                                                    )
**THOMAS A. MURPHY, JR.,**                          )
                                                    )
            **Plaintiff,**                          )
                                                    )
            **v.**                                  )        **Civil Action No. 13-10748-DJC**
                                                    )
**CAROLYN COLVIN, Acting Commissioner,**            )
**Social Security Administration,**                 )
                                                    )
            **Defendant.**                          )
_____)

## MEMORANDUM AND ORDER

**CASPER, J.**                                                          **August 6, 2014**

## I.      Introduction

Plaintiff Thomas A. Murphy, Jr. ("Murphy") filed claims for disability insurance benefits

("SSDI") and supplemental security income ("SSI").  R. 13.[1]  Pursuant to the procedures set

forth in the Social Security Act, 42 U.S.C. §§ 405(g), 1383(c)(3), Murphy now brings this action

for judicial review of the final decision of Carolyn Colvin, Acting Commissioner of the Social

Security Administration ("the Commissioner"), issued by an Administrative Law Judge ("ALJ")

on March 21, 2012.  R. 27.  Before the Court are Murphy's motion to reverse and remand, D. 16,

and the Commissioner's motion to affirm the decision of the ALJ.  D. 20.  For the reasons

discussed below, the Commissioner's decision is AFFIRMED.

---

[1] Citations to the administrative record in this case, filed at D. 10, are referenced as "R."

## II. Factual Background

Murphy was 26 years old when he ceased working on January 1, 2008. R. 13, 26. He previously worked as a fire alarm tester, fire sprinkler fitter and installer, detailer for vehicles and trucks, dishwasher, bagger, cashier and a donut shop baker. R. 25-26. In his May 22, 2009 and November 12, 2009 applications for SSDI and SSI, he alleged disability due to generalized anxiety disorder, social phobia, agoraphobia with panic attacks and dysthymic disorder. R. 13, 16.

## III. Procedural Background

Murphy filed claims for SSDI and SSI, asserting that he had been unable to work as of January 1, 2008. R. 13. The SSA denied the claims after initial review on March 16, 2010. Id. The agency again denied his claims on October 28, 2010. Id. Pursuant to SSA regulations, on January 3, 2011, Murphy filed a timely request for a hearing before an ALJ. Id. The hearing was held on February 16, 2012. Id. Murphy and Peter Mazarro, a vocational expert ("VE"), testified at the hearing. Id. In a written decision dated March 21, 2012, the ALJ ruled that Murphy did not have a disability, as defined by the Social Security Act, and denied Murphy's claims. R. 27.

Although Murphy's claims were selected for review by the Appeals Council ("AC"), the AC did not complete a review of Murphy's claim, as they found no reason under the rules to do so. R. 1. Therefore, the ALJ's decision is the final decision of the Commissioner. Id.

## IV. Discussion

### A. Legal Standards

#### 1. Entitlement to Disability Benefits and Social Security Income

A claimant's entitlement to SSDI and SSI turns on whether he has a "disability," which is defined in this context as an "inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or has lasted or can be expected to last for a continuous period of no less than twelve months." 42 U.S.C. §§ 406(i), 423(d)(1)(a); 20 C.F.R. § 404.1505. The inability must be severe, rendering the claimant unable to do any of his previous work or any other substantial gainful activity which exists in the national economy. 42 U.S.C. § 423(d)(2); 20 C.F.R. §§ 404.1505-404.1511.

The Commissioner must follow a five-step process when she determines whether an individual has a disability, and, thus, whether that individual's application for benefits will be granted. 20 C.F.R. § 416.920. All five steps are applied to every applicant; the determination may be concluded at any step along the process. Id. First, if the applicant is engaged in substantial gainful work activity, then the application is denied. Id. Second, if the applicant does not have or has not had within the relevant time period, a severe impairment or combination of impairments, then the application is denied. Id. Third, if the impairment meets the condition for one of the "listed" impairments in the Social Security regulations, then the application is granted. Id. Fourth, if the applicant's "residual functional capacity" ("RFC") is such that he can still perform past relevant work, then the application is denied. Id. Fifth, and finally, if the applicant, given his RFC, education, work experience and age, is unable to do any other work, the application is granted. Id.

2.    *Standard of Review*

The Commissioner's role is to use her discretion to consider and weigh evidence and make findings and credibility determinations. See Whitzel v. Astrue, 792 F. Supp. 2d 143, 148 (D. Mass. 2011). Under 42 U.S.C. § 405(g), the Courts must accept the factual findings of the

Commissioner as conclusive "if supported by substantial evidence." 42 U.S.C. § 405(g). Substantial evidence may be found where "a reasonable mind reviewing the evidence in the record as a whole, could accept it as adequate to support [the Commissioner's] conclusion." Rodriguez v. Sec'y of Health and Human Servs., 647 F.2d 218, 222 (1st Cir. 1991). Further, the reviewing Court must adhere to these findings "even if the record arguably could justify a different conclusion, so long as it is supported by substantial evidence." Whitzel, 792 F. Supp. 2d at 148 (citing Rodriguez Pagan v. Sec'y of Health and Human Servs., 819 F.2d 1, 3 (1st Cir. 1987)).

B. **Before the ALJ**

*1. Medical History*

Before the ALJ was extensive evidence about Murphy's medical history, including diagnosis and treatment, particularly in regard to the conditions upon which Murphy relied in claiming a disability in his application for SSDI and SSI benefits.

On January 15, 2009, Dr. Ernst Manigat evaluated Murphy for a psychopharmalogical assessment. R. 330. At this time, Murphy told Dr. Manigat that he had increased anxiety after his job loss, could not go anywhere without his girlfriend and felt depressed due to his situation. Id. Dr. Manigat noted that Murphy was anxious, his memory, attention and concentration were intact and that he showed no sights of psychomotor depression. R. 331. Dr. Manigat diagnosed him with social phobia and generalized anxiety disorder with a Global Assessment of Functioning of ("GAF") of 55,[2] and prescribed Zoloft and Lorazepam. Id. Future visits showed improvements in Murphy's symptoms. R. 332-336.

_____

[2] The GAF scale is used to report a clinician's judgment of the individual's overall level of psychological, social, and occupational functioning. See American Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders 32-33 (4th ed., text rev. 2000) ("DSM-

Upon Dr. Manigat's relocation, Murphy started sessions with Diane Thomas, a licensed mental health counselor, at Health and Education Services, Inc. on October 8, 2009. R. 340. He was anxious, not well kept, had trouble sleeping and difficulty getting out of bed and the house. R. 340-341. Here, Murphy was assigned a GAF of 48.[3] R. 354. He was prescribed Ativan and Buspar and at further sessions claimed to be doing better. R. 348-352. During this time, he also met with Janine Post-Anderle, nurse practitioner, for medication management. R. 337-339. During these visits, he seemed to be improving with medication and appeared to do well with fewer people around him. Id. Murphy missed his next sessions with Thomas in December 2009, and the treatment was terminated in February 2010. R. 353.

On October 12, 2010, Murphy had a consultative examination with Stanley Rusnak, Jr., Ed.D. R. 301. At this point, he was living and working at the Salvation Army Center and had applied for disability benefits. R. 301. Murphy denied any recreational drug use, arrests and prison and probation time. R. 302. Murphy claimed not to have taken his medication in five months. Id. During his examination, his mood was stable but he seemed depressed. R. 303. He had poor rapport and limited eye contact. R. 302-303. Rusnak felt that Murphy would benefit from being back on his medication and assigned him a GAF of 50. R. 305.

On October 26, 2010, Judith Kellmer, Ph.D. completed a psychiatric review, finding that Murphy had a mild restriction in activities of daily living, moderate difficulty in maintaining social functioning, moderate difficulty maintaining concentration, persistence or pace and one or

---

IV"); Munson v. Barnhart, 217 F. Supp. 2d 162, 164 n. 2 (D. Me. 2002). GAF scores in the 51-60 range indicates "[m]oderate symptoms . . . or moderate difficulty in social, occupational, or school functioning. DSM-IV 34.

[3] A GAF of 41-50 is indicative of a "serious impairment in social, occupational or school functioning." DSM-IV 34; Amarai v. Commissioner of Social Sec., 797 F. Supp. 2d 154, 158 n. 1 (D. Mass. 2010).

two episodes of decompensation.  R. 321.  She also found that he could work in a low stress, predictable setting.  R. 309.

On May 13, 2011, Murphy met with Dr. Robert Van Wittenberghe for a psychiatric evaluation.  R. 364.  Upon examination, Dr. Van Wittenberghe felt that Murphy was primarily interested in receiving social security benefits, rather than treatment.  R. 365.  Statements by Murphy such as, "I cannot wait to get on disability," R. 360, and statements claiming that Murphy saw himself still receiving disability benefits five years from now, led Dr. Van Wittenberghe to such conclusions.  R. 361.  Further, Dr. Van Wittenberghe was confused as to why Murphy was unable to obtain employment, given Murphy's pleasant demeanor, as well as his ability to use public transportation to come to appointments.  R. 357.  Though Dr. Van Wittenberghe diagnosed Murphy with social phobia, agoraphobia with panic attacks, chronic depression and dysthymic disorder, with a GAF of 55-60, R. 364, he felt that disability benefits would give Murphy no incentive to leave his home.  R. 366.  He continued Murphy on Ativan and was puzzled that Murphy did not need a higher dosage, despite his claims of debilitating anxiety.  Id.  Murphy also reported that the medication was working somewhat.  R. 360.  Dr. Van Wittenberghe also prescribed Celexa.  Id.  During subsequent visits, Dr. Van Wittenberghe tried to convince Murphy to engage in activities to improve his condition, R. 363, but Murphy spoke only about receiving disability benefits.  R. 360.  Murphy also had no interest in returning to work, did not like being around other people and preferred to stay at home and watch television. Id.

Anita Nichols-Habib, a licensed mental health counselor, evaluated Murphy on July 6, 2011.  R. 402.  Murphy complained of "abuse and neglect" during childhood and symptoms of anxiety and depression.  R. 395.  He also admitted to shoplifting and a history of alcohol and

tobacco abuse. R. 397-398. Nichols-Habib diagnosed Murphy with anxiety disorder NOS and assigned him a GAF of 55-60. R. 401. Murphy also continued seeing Dr. Van Wittenberghe, but reported to Nichols-Habib about being unhappy that Dr. Van Wittenberghe thought Murphy only wanted disability and did not want to work. R. 414. In September 2011, Murphy started seeing a clinical prescriber at Arbour Counseling. R. 417. Murphy reported symptoms of anxiety, depression and panic. R. 418. He continued his dose of Ativan and Celexa and was resistant to a dose increase. Id.

On November 14, 2011, Dr. Michael Perlman, a physician who had never treated Murphy, completed questionnaires regarding Murphy's medical condition. R. 422-430. Dr. Perlman reported moderately severe to severe limitations in all areas of work-related functioning. R. 423. Dr. Perlman also concluded that Murphy had marked restrictions in daily living, "maintaining social function" and "maintaining concentration, persistence or pace." R. 429. He stated that Murphy claimed that although he had worked a variety of jobs in the past, he no longer had this ability, given anxiety, past trauma and back pain. R. 424.

2. *ALJ Hearing*

At the February 16, 2012 administrative hearing, the ALJ heard testimony from Murphy and the VE. R. 35. Murphy testified that he last worked in shipping and receiving. R. 48. He also testified that he could not continue working because he "couldn't even function" or "think straight at work anymore." R. 48. Murphy reported that he was also unable to sit and stand for too long due to his scoliosis, for which he had not sought treatment. R. 56-57. Murphy further testified about his previous heroin and suboxone use. R. 58-59. He also discussed his daily routine and his depressed and unmotivated mood. R. 60-61. Murphy testified about his relationship with Dr. Van Wittenberghe and claimed that they had very different opinions about

where his life was and should be headed. R. 53-54. Murphy found Dr. Van Wittenberghe's treatment was not sympathetic to Murphy's condition or his need for disability benefits. Id.

The ALJ then asked the VE whether a person with the age, education and work experience similar to Murphy, able to work at sedentary, light and medium exertional levels, with minor interferences in concentration, could perform jobs with routine repetitive jobs and other normal work functions up to and including semi-skilled work. R. 72-73. The VE answered yes. R. 73-74. He testified that such a person could perform most of Murphy's past relevant work, except that of a fire alarm tester and sprinkler fitter, and he could perform other work in the national economy including mail sorter, store's laborer or commercial cleaner. R. 74-75. In response to a hypothetical question from Murphy's attorney that involved a claimant with certain moderate limitations that affected his ability to stay on task fifteen percent of the time and required absences twice a month, the VE testified that such person would not be employable. R. 75-77. The VE also testified that the same would be true if the same claimant had an extreme limitation in his ability to handle customary work pressure. R. 76-77.

### 3. Findings of the ALJ

Following the five-step process, 20 C.F.R. § 416.920, at step one, the ALJ found that Murphy was not engaged in substantial gainful activity and had not been since January 1, 2008. R. 15. At step two, the ALJ found that Murphy had a severe impairment, namely a history of substance abuse. R. 16. At step three, the ALJ found that Murphy's mental impairment did not satisfy any of the listed impairments. R. 17. At the next step, ALJ found that Murphy had a residual functional capacity to perform sedentary, light and medium work, except that he would have occasional, minor interference in concentration, but is able to perform routine, repetitive tasks and normal work functions, up to and including semi-skilled work. R. 17. The ALJ gave

greatest weight to the records of Dr. Manigat, Thomas, Post-Anderle and Dr. Van Wittenberghe, on the basis that their findings were consistent and they showed "that while the claimant had some anxiety related complaints, he responded extremely well to medication." R. 25. Further, the ALJ considered the entire record to corroborate the intensity, persistence and effects of Murphy's reported symptoms with the objective medical evidence. See R. 24-25. The ALJ, however, found that although the impairments could cause the symptoms reported by Murphy, such self reports were not credible to the extent that they were inconsistent with the above residual functional capacity assessment finding. R. 24-25. The ALJ also noted that Murphy had downplayed his positive response to medication and had been less than forthcoming about his history of heroin abuse. R. 24. Finally, at step five, the ALJ found that Murphy was capable of performing past jobs, including those as a donut shop baker, bagger, cashier, dishwasher and detailer. R. 25-26. Further, given the testimony of the VE, the claimant's age, education, work experience and residual functional capacity allowed Murphy to find other work that exists in significant numbers in the national economy. R. 26.

### C. Murphy's Challenges to the ALJ's Findings

Murphy contends that the ALJ erred in crediting the medical records of Dr. Van Wittenberghe, as that doctor allegedly failed to consider medical issues and inserted his personal biases into his medical opinions. For the reasons discussed below, the Court concludes that the ALJ did not err in assigning greater weight to the medical records of Dr. Van Wittenberghe, as his findings are supported by objective medical evidence and are consistent with the findings of other treating physicians.

"It is the responsibility of the [ALJ] to determine issues of credibility and to draw inferences from the record evidence." Irlanda Ortiz v. Sec'y of HHS, 955 F.2d 765, 769 (1st Cir.

1991)(citation omitted). The ALJ's findings are conclusive unless he has ignored evidence, misapplied the law or judged medical matters that are best be left to experts. See, e.g., Nguyen v. Chater, 172 F.3d 31, 35 (1st Cir. 1999) (remanding case where ALJ improperly rejected records of treating physician leading to findings unsupported by substantial evidence). The Court may also remand cases where the ALJ has provided insufficient explanations for his findings or has failed to consider relevant evidence. See Seavey v. Barnhart, 276 F.3d 1, 12 (1st Cir. 2001).

Here, the ALJ's decision was supported by substantial evidence and that the ALJ appropriately used his discretion in assigning weight to each medical opinion, taking into account Murphy's relationship to the examiner, the overall consistencies of the record and findings supported by objective medical evidence. See R. 25-27; Evangelista v. Sec'y of Health and Human Servs., 826 F.2d 136, 144 (1st Cir. 1987) (stating that the ALJ may "piece together the relevant medical facts from the findings and opinions of multiple physicians"). Generally, the ALJ should award "more weight" to opinions of treating physicians, "since these sources are likely to be the medical professionals most likely to be able to provide a detailed, longitudinal picture of [the] medical impairments." 20 C.F.R. § 404.1527(c)(2). If such opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and not inconsistent with the other substantial evidence in [the] case record," then it is given "controlling weight." Id.; Guyton v. Apfel, 20 F. Supp. 2d 156, 168 (D. Mass. 1998) (giving no controlling weight given to physician's report where its findings were not backed by medical evidence and differed from those of other physicians); Berrios-Velez v. Barnhart, 402 F. Supp. 2d 386, 392 (D.P.R. 2005) (controlling weight not assigned to treating physician where findings differed

from all physician's reports which found that claimant to be in stable condition and had ability to sit, stand and walk).

Murphy argues that "[t]he ALJ noted that Dr. Van Wittenberghe made some inconsistent statements regarding the claimant." D. 17 at 10. A closer look at the ALJ's decision shows that the ALJ found Dr. Van Wittenberghe's findings were not inconsistent with the medical evidence as a whole, including the treatment records of other doctors, but such was not the case with Dr. Perlman's opinions. R. 25; 396-398. The ALJ requested an additional opinion for clarification from Dr. Van Wittenberghe, but Murphy's lawyer was hesitant, claiming that because Dr. Van Wittenberghe had a disability himself (mobile only with wheelchair) he was biased against Murphy's inability to find work despite his disability. R. 38-41; see R. 51-54, 65-68.

The ALJ, thereafter, awarded greater weight to the treatment records of Dr. Van Wittenberghe, among others, including, Dr. Manigat, Thomas and Post-Anderle. R. 25. The ALJ considered, but rejected Murphy's argument that Dr. Van Wittenberghe was biased against his application for disability. Id. The ALJ found that the records of Dr. Van Wittenberghe were consistent with these other treating sources. Id. The ALJ assigned less weight to the records of Nichols-Habib, Schwartz, Dr. Perlman and Kellmer, as these other sources has less opportunity to treat Murphy or provided little medical support for their findings. Id. Specifically reflected in the records of other treating sources, Dr. Van Wittenberghe determined that although Murphy was suffering from social phobia, agoraphobia with panic attacks and dysthymic disorder, he responded very positively to medication. R. 366. With medication, his ability to function and work was only slightly limited. Id. Similarly, Dr. Manigat found that with medication, Murphy showed marked signs of improvement and was able to walk the dog, leave the house and talk to his friends. R. 332-336. His GAF assessment of 55 reflected that Murphy would only be

moderately impaired in social, occupational or school related functioning. R. 331. Likewise, Thomas's and Post-Anderle's records show that Murphy showed improvements with medication. R. 337-338, 348-352.

The findings of Dr. Perlman, Nichols-Habib, Schwartz and Kellmer pointed to different functioning levels than those assessed by the sources discussed above. R. 309, 394-401, 425-433. Although Nichols Habib assigned a GAF of 55 to Murphy, in her questionnaire, she noted moderately severe to severe limitations, giving no explanation for these conclusions. R. 401. Over the course of treatment, she also indicated no decline in Murphy's ability to function. R. 395-397. The reports of Dr. Perlman were given less weight because he had no opportunity to observe and treat Murphy, R. 37, and the ALJ concluded that he likely conducted an evaluation based on the treatment notes of Nichols-Habib and Schwartz. R. 25. Dr. Perlman reported a level of limitation in living and work-related functioning that was unsupported by the other reports or an objective analysis of Murphy's medical conditions. R. 422-429. Finally, Kellmer based her findings on Murphy's functioning without medication. R. 25; 323. She too had little opportunity to treat and observe Murphy. Id.

Murphy relies on Coggon v. Barnhart, 354 F. Supp. 2d 40 (D. Mass. 2005) to support his argument that Dr. Van Wittenberghe's "predisposition for advocating against the claimant" should completely discount his opinions. D. 17 at 2. However Coggon does not support his conclusion. See Coggon, 354 F. Supp. 2d at 54 (concluding that where a medical opinion advocates a certain position with no objective analysis, the ALJ may give less weight to that record). In Coggon, the claimant was diagnosed with rheumatoid arthritis, but she was able to drive and was found to be capable of dressing, grooming and light chores. Id. at 44-45. The treating physician's findings on Coggon's condition were vague, inconsistent (with themselves

and those of other physicians) and void of adequate support in the medical records.  <u>Id.</u> at 53.

Among other things, she was unable to quantify Coggon's degree of limitation or state why

Coggon would be absent from work.  <u>See id.</u>  Further, the physician found that Coggon was

bedridden, even though she said the claimant was able to live alone and drive.  <u>Id.</u> at 54.  Given

such inconsistencies, the court held that the ALJ had correctly concluded that the record as a

whole pointed to a higher level of functioning by the claimant than did this doctor's opinions.

<u>Id.</u>  By contrast in the instant case, there was ample basis in the record for Dr. Van

Wittenberghe's opinions, which were also consistent with reached with those of other treating

physicians.  Moreover, Dr. Wittenberghe's medical records appropriately reflect questioning the

veracity of Murphy's reports of his symptoms and medical history for the purposes of reaching a

sound medical opinion as opposed to advocacy of a particular position about his claimed

disability.  Unlike the physician in <u>Coggon</u>, there was ample support in the record for this

doctor's medical opinions and the ALJ did not err in relying on them, in part, in reaching his

decision in this case.

**V.  Conclusion**

Based on the foregoing, the Commissioner's motion to affirm, D. 16, is ALLOWED and

Murphy's motion to reverse and remand, D. 20, is DENIED.

**So ordered.**

/s/ Denise J. Casper
United States District Judge